**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1755**

SHEAN EMMONS; JOHN GIBSON; KEVIN SMITH; BRIAN FANCHER;
CARLTON ACKISS; MICHAEL WINSLOW; CHRISTINE DOSMANN,

Plaintiffs – Appellants,

v.

CITY OF CHESAPEAKE,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at
Norfolk. Lawrence Richard Leonard, Magistrate Judge. (2:18-cv-00402-LRL)

Argued: October 27, 2020                    Decided: December 4, 2020

Before WILKINSON, MOTZ, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Motz
and Judge Agee joined.

**ARGUED:** James R. Theuer, JAMES R. THEUER, PLLC, Norfolk, Virginia, for
Appellants. Randy C. Sparks, Jr., KAUFMAN & CANOLES, P.C., Richmond, Virginia,
for Appellee. **ON BRIEF:** Sharon Kerk Reyes, KAUFMAN & CANOLES, P.C., Norfolk,
Virginia; Jacob P. Stroman, Melissa A. Hamann, OFFICE OF THE CITY ATTORNEY,
Chesapeake, Virginia, for Appellee.

WILKINSON, Circuit Judge:

The appellants in this case are Battalion Chiefs who have sued their employer, the City of Chesapeake Fire Department (CFD), for non-compliance with the overtime pay requirement of the Fair Labor Standards Act (FLSA). This requirement represents a general guarantee of overtime pay for employees working over forty hours a week. 29 U.S.C. § 207(a)(1). This general guarantee is, however, subject to a number of exemptions for employees working in managerial, administrative, and professional positions. 29 U.S.C. § 213(a)(1). The Battalion Chiefs (BCs) argue that none of these exemptions apply to them, both on their own terms and because the BC position falls under a regulatory exception, 29 C.F.R. § 541.3(b), that categorically withdraws certain first response workers from the exemptions' scope.

We disagree. Section 541.3(b) does not categorically except the plaintiff BCs from the FLSA's system of exemptions, because the BCs are, first and foremost, managers within the CFD, not frontline firefighters. Nor do the plain terms of the FLSA's exemptions fail to apply. The BCs are executive employees under the FLSA, and it is on this basis that we affirm the district court's grant of summary judgment in favor of the CFD.

I.

The Chesapeake Fire Department consists of 449 employees spread across five operational divisions. J.A. 664. The CFD maintains an effective organization through the use of a well-defined, hierarchical command structure. The most basic distinction within this hierarchy is that between "chief officers" and everyone else. The "chief officer"

2

category comprises, in order of rank, the Fire Chief, the Deputy Fire Chief, the Division Chiefs, and finally, the BCs. Only sixteen CFD employees hold a chief officer position and, of these sixteen, ten are BCs in the Fire Operations Division. Among the non-chief officers, there is a further bifurcation between Company Officers, who have attained the rank of either captain or lieutenant, and firefighters, who range in their ranks from "master" to "trainee."

This command structure allocates between three and four BCs to each of the CFD's three fire battalions. Each battalion consists of five fire stations and their personnel. The upshot of this structure, in terms of command, is that each BC bears responsibility for between six and seven Company Officers and, indirectly, for the thirty-one to forty-six firefighters under them. Each BC works seven 24-hour shifts every twenty-one days.

The in-station duties that BCs must perform are extensive. Most of these duties fall under one of five heads: staffing; supervision; administration; budgeting; or hiring. In the context of the Fire Operations Division, "staffing" refers to the process of solving, each and every day, the problem of ensuring an appropriate match between key pieces of emergency response equipment, like a battalion's fire engines, and the firefighters qualified to operate them. Staffing can require shifting both firefighters and equipment among units and even among stations. It also requires close attention to shifting leave schedules and to variations in operational needs and operational readiness.

In making these staffing decisions, however, BCs are not constantly reinventing the wheel. Rather, they execute an official CFD staffing policy. This staffing policy contains a detailed set of directives that provides for several common contingencies. For example,

3

the staffing policy indicates that Engines 6, 10, 11, and 13 must be staffed by a minimum of four firefighters, and that, if such staffing is not initially available and no fill-ins can be scheduled on those Engines, other four-member Engines should be reduced to three, so that the needed staff can be reassigned. Which members to pull from which other Engines, though, is left to the BC's discretion. As this example suggests, the execution of the staffing policy is anything but robotic. It requires the prudent decision-making of BCs with a keen understanding of the firefighters under their command and their battalion's "operational needs." J.A. 642–43. It also requires awareness of the impact of staffing decisions, which can implicate overtime pay, on the CFD budget.

Also within the sphere of BCs' staffing duty is the duty to review and decide on requests for leave. As above, an official CFD leave policy sets the broad contours of BCs' decision-making, without eliminating the important role of BC discretion. BCs, who must be ever-mindful of their battalion's staffing necessities, exercise this discretion over matters such as whether to grant leave requested after the official deadline, whether to permit sick leave on the basis of "extenuating circumstances," J.A. 898, and how to schedule their own leave time.

A BC's supervisory responsibilities consist in evaluating the performance of the firefighters under his command, training them, and, when necessary, administering or recommending discipline. As for evaluations, BCs evaluate Company Officers individually on their overall performance during a given year. They also meet with the Company Officers regularly to discuss how said Officers handled particular emergency responses; the purpose of these station visits is to identify areas of strength and weakness

4

and to provide the "coaching and feedback" necessary for improvement. J.A. 437–41. Looking further down the chain of command, BCs also review Company Officer evaluations of lower-ranking firefighters, monitor the progress of new recruits, and assess the mental preparedness of their entire battalions for emergency response, J.A. 586.

The BCs also manage the training of those under their authority. The training matrix—a table describing what types of training are required of every CFD employee, based on his rank and assignment—and the training schedule come to the BCs as a given, from higher up in the CFD. BCs do, however, possess the discretion to add training drills to the schedule, based, for example, on their impressions from one of the aforementioned station visits. BCs attend drills to ensure their satisfactory performance and to evaluate the performance of individual firefighters. If a drill is not performed with sufficient skill or effort, a BC may require its repetition.

The BCs also exercise disciplinary authority. This authority extends to addressing infractions of departmental regulation through verbal counseling or reprimand, or through the issuance of a form disciplinary letter. To sanction misconduct through suspension, demotion, or termination, however, a BC must first gain the approval of individuals higher up in the CFD. Disciplinary recommendations that BCs do submit are often but not always adopted. *See* J.A. 361 (BC Ackiss testifying he could not "recall a time when [his disciplinary] recommendation[s] were not approved"); *see also* J.A. 1332.

Finally, BCs make hiring and advancement recommendations to their superiors. BCs sometimes make these recommendations pursuant to their participation in hiring panels, on which at least one Division Chief or BC customarily sits. They make others

5

outside of the panel setting, such as, for example, when BCs identify officers well-suited to serve as Acting Battalion Chiefs. The BCs recommendations on advancement to Acting Battalion Chief, it should be noted, have all been adopted without exception.

In addition to all of their in-station duties, BCs have a role to play in the CFD's direct emergency response. Of all the emergencies to which the CFD responds, BCs themselves are dispatched, on average, only to approximately one out of every ten. The ten percent of incidents to which BCs are dispatched tend to be complex, and include such emergencies as: commercial fires, residential structure fires, aircraft accidents, cardiac arrest events, and flammable liquid spills or leaks. In contrast, captain-rank Company Officers are dispatched to approximately thirty-three percent of all calls, and lieutenant-rank Company Officers are dispatched to sixty-nine percent.

A BC's position authorizes him to exercise discretion over dispatches that, were he a Company Officer, he would simply need to take as given. A BC may, for example, remove himself from service, so as not to be available for dispatch at all, for several consecutive hours without the prior approval of a superior officer. Furthermore, even upon receiving a dispatch, it is within a BC's authority to cancel the entire call, if he determines that response is unnecessary. BCs may also add themselves to a call, again solely at their own discretion.

BCs travel to the scene of emergencies in command vehicles outfitted with a radio suite, computers, and command boards, as well as other emergency response equipment, such as a self-contained breathing apparatus, lights, and sirens. These vehicles do not contain foam concentrate, attack hoses, or supply hoses. J.A. 1257. While *en route*, BCs

6

are already analyzing data received from the dispatch to formulate a response plan. Even before arriving, a BC has the authority to call additional units to the scene or cancel responding units, as the BC deems fit. BCs arrive at the scene wearing personal protective equipment.

And once they do arrive at the scene, BCs may assume command over all inferior officers who may have already arrived. Any Company Officer already functioning as the Incident Commander is typically relieved of that status, at which point the BC returns to his command vehicle to manage the incident. The nature of the BC's activity under these circumstances is to coordinate the response, so as to maximize the response team's achievement of "tactical priorities," which include: "provid[ing] for life safety by removing endangered occupants and treat[ing] the injured"; "stabiliz[ing] the incident"; "conserv[ing] property"; and "provid[ing] for the safety, accountability, and welfare of personnel." J.A. 167. Consequently, the BC does not typically engage in any hands-on firefighting, such as handling hoses, climbing ladders, or entering burning structures.

Like all other chief officers, BCs do not receive overtime pay. The annual salaries of the ten BCs that the CFD employed in 2017 to 2018 were all in excess of $455 per week, and averaged $98,774.65 per year, with a low of $78,141.98 and a high of $112,126.02. J.A. 1314–15. Captains, who do receive overtime pay, had an average gross pay of $97,980.65 during the same period.

7

In 2018, the plaintiff BCs filed suit against the CFD under the Fair Labor Standards Act (FLSA) and Virginia Gap Pay Act for unpaid overtime and gap wages. [1] J.A. 14–15. The district court granted the parties' joint motion to bifurcate discovery into a liability and a damages phase. At the conclusion of discovery as to liability, both parties moved for summary judgment. The district court granted summary judgment in the CFD's favor, finding that management, not first response, was the BCs' primary duty. The BCs were not, therefore, excluded from the executive exemption to the FLSA's overtime requirement.

## II.

This court reviews a district court's grant of summary judgement *de novo*, *Morrison v. County of Fairfax*, 826 F.3d 758, 765 (4th Cir. 2016), drawing all reasonable inferences in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). Summary judgment is appropriate where there is no dispute of material fact and judgment is proper as a matter of law. *Id.* The determination of an employee's primary duty, central to the dispute between the parties here, presents a mixed question of fact and law. The precise duties of the BC position are a matter of fact; whether those facts will support an inference that the BCs' primary duty is management or frontline firefighting is a matter of law. The Supreme Court articulated this division clearly in *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986): "The question of how the respondents spent their working time on board the *Arctic Star* is a question of fact. The question whether their

---

[1] On appeal, the BCs do not challenge the district court's determination that their claims under the Virginia Gap Pay Act stand or fall with their claims under FLSA.

particular activities excluded them from the overtime benefits of the FLSA is a question of law."

## III.

The FLSA requires, in relevant part, that employers pay their employees at a rate equal to one-and-a-half times their standard hourly rate for every hour they work in excess of forty during a given week. 29 U.S.C. § 207(a)(1). This provision serves the FLSA's stated purpose of remedying "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202. The FLSA, however, also articulates exemptions to the general rule of § 207, which function to ensure that the limiting principles, no less than the aspirational ones, in the FLSA's stated purpose are respected. Among these exemptions are those contained in § 213(a)(1). This section narrows § 207's scope, so as to exclude any worker "employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). Congress, however, chose not to clarify the meaning of § 213(a)(1)'s key terms within the FLSA itself; rather, it entrusted this task to the Department of Labor, which has, over time, promulgated a series of regulations to that end.

At the center of this case—about whether Section 213(a)(1)'s executive exemption covers the CFD BCs—is interpretive regulation 29 C.F.R. § 541.3(b) (the First Responder Regulation). The First Responder Regulation categorically excludes certain classes of worker from the FLSA's exemptions, including *inter alia*: "police officers, detectives . . . fire fighters . . . rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or

9

extinguishing fires of any type; rescuing fire, crime or accident victims . . . or other similar work." *Id.* § 541.3(b)(1). Stated otherwise, if an employee falls into one of these enumerated classes, then the FLSA's executive exemption does not apply and that employee must be paid overtime in accordance with 29 U.S.C. § 207.

But these classes must be approached with caution. An employee is not a "fire fighter" under the First Responder Regulation merely because, for example, the words "fire fighter" appear in his job title, 29 C.F.R § 541.2, or because he happens to be employed by a fire department. To do so would be to privilege form over substance in a manner at odds with both the internal logic and the purpose of the FLSA. Avoiding this mistake, 29 C.F.R. § 541.3(b)(2) identifies the essential criterion accordingly: "[The employees listed in § 541.3(b)(1)] do not qualify as exempt executive employees *because their primary duty is not management* of the enterprise in which the employee is employed." *Id.* § 541.3(b)(2) (emphasis added). Section 541.3(b)(1) presupposes, therefore, that the primary duty of each enumerated group is not to "manage[] the enterprise" but rather to engage in particular sorts of hands-on activity, such as—in the case of fire fighters—extinguishing fires and rescuing fire and accident victims. An individual whose work does not meet this criterion, though he might be called a "fire fighter" in some other, colloquial sense, cannot be deemed one under § 541.3(b).

Thus, determining what counts as the CFD BCs' primary duty assumes central importance. The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Determination of an employee's primary duty is fact-sensitive, *id.* (it "must be based on all the facts in a

10

particular case"), and must focus on the substance of his work as performed in practice. Section 541.700 states that determination of an employee's primary duty ought to include consideration of the following four factors: "[1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

A.

Each of these four factors will be taken in turn. However, because factors one and two both incorporate a distinction between work that is exempt and work that is not, we preface our four-factor analysis with a discussion of which of the BCs' duties are managerial, and therefore exempt. The relevant regulations define "management" as follows:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; . . . disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used . . . ; [and] planning and controlling the budget . . . .

29 C.F.R. § 541.102. The picture that emerges is of management as an act of authority, formed in some degree through independent judgment, by which the members of an enterprise, and their affairs, are ordered toward its end. Accordingly, the principal

11

expression of a manager's discretion consists in determining, to a greater or lesser degree, how others within the enterprise will act to advance the purpose for which the enterprise exists.

Supplemental guidance issued by the Department of Labor helps clarify this picture, specifically in the context of the First Responder Regulation, by offering further examples of duties that are managerial, including:

> [E]nsuring operational readiness through supervision and inspection of personnel, equipment and quarters; deciding how and where to allocate personnel . . . [and] directing operations at . . . fire . . . scenes, including deciding whether additional personnel or equipment is needed.

69 Fed. Reg. 22,130 (Apr. 23, 2004) (the Preamble). This clarification is especially edifying in the context of emergency response because, as the district court observed, it distinguishes clearly between officers whose primary responsibility is to develop an emergency response plan, and those whose primary responsibility is not to debate it or revise it, but to effect it by taking direct action. J.A. 1324. As such, it elaborates seamlessly on the same theme expressed in § 541.102, and recognizes the real difference between the firefighter at the frontlines, who must rush into a burning building, and the commander whose job it is to ensure that he is doing so in the right way and at the right time. *See Mullins v. City of New York*, 653 F.3d 104, 115 (2d Cir. 2011) (adopting the Department of Labor's interpretation of the Preamble as treating the "high-level direction of operations by fire chiefs and fire captains who generally did not engage in any front-line firefighting" as managerial).

12

Under these regulations, the staffing and supervisory duties that the plaintiff BCs perform in-station constitute exempt managerial work. Staffing, which BCs must engage in on a daily basis, is a typical managerial activity. As described above, the BCs' staffing duties require them to use their discretion under the CFD's staffing policy to ensure that vital pieces of emergency response equipment, like the CFD's fire engines, are appropriately matched to groups of firefighters that have the numbers, skill, and experience to operate them. BCs' staffing decisions determine where, when, and how firefighters will be expected to work, what equipment, if any, can be staffed short, whether certain firefighters may be able to take leave, and how the next day's operations are likely to impact the CFD's budget. If this kind of activity does not constitute "planning the work," "apportioning the work," and "deciding how and where to allocate personnel," it is difficult to imagine what could. 29 C.F.R. § 541.102; 69 Fed. Reg. 22,130.

BCs' in-station supervisory duties are also managerial. They monitor, evaluate, and guide the performance of their Company Officers both generally and on the basis of their response to specific emergencies. They watch over the development of fresh recruits and, whether dealing with recruits or captains, enforce CFD discipline. If the BC determines that something sterner than a verbal or written reprimand is required, the BCs initiate the process by filing a recommendation for consideration higher up the chain of command. As for training, if the BC, monitoring the operational readiness of his firefighters, finds their competency in a particular area wanting, he has the independent discretion to order additional training, and to decide when that training has been completed to his satisfaction. Again, that these activities constitute "training" employees, "disciplining" them, and

13

"maintaining operational readiness through inspection and supervision of personnel," is clear. *Id.*

The BCs' attempt to mitigate the significance of these undisputed facts by observing, for example, that BCs cannot exercise their discretion in contravention of official CFD policies, like the staffing policy mentioned above, which the plaintiffs characterize as highly restrictive. But this characterization is mistaken. The staffing policy consists of a set of high-level directions that hardly negate the need for discretionary judgement on the part of a well-prepared BC. A BC must be capable of using his understanding of the operational challenges facing his battalion, of the status and aptitude of the men under his command, and of the short- and long-term impacts his assignment strategies are likely to have on the readiness of his battalion in order to make sound decisions. Rather than barring meaningful discretion, then, the effectiveness of the CFD staffing policy actually presupposes its competent exercise.

And it is, more generally, no argument against the managerial nature of an employee's activities to imply that said employee could always enjoy *more* liberty or exercise *more* control. The appreciable independent judgment BCs must exercise in coordinating and monitoring their firefighters' work does not dwindle to nothing simply because greater authority over certain matters lies higher up in the chain of command. To find otherwise would be to define "management" more narrowly than the applicable regulations allow.

As for matters touching directly on emergency response, the uncontested facts in the record show that CFD BCs are not frontline firefighters; their responsibility and their

14

authority are distinctly managerial under the terms of the Preamble. The principal role of a BC responding to any emergency is unambiguous: to strategize and to command. A BC's response vehicle does not come outfitted with hoses, ladders, or fire retardant, but rather with computers, control boards, and a radio suite. This is only fitting, given that the BC on scene assumes command by default, and his vehicle serves as the locus of all his activity during a typical response. The BC is not expected to shout instructions while scaling ladders or handling hoses with his men at the frontlines. He is expected, instead, to remain, for the most part, in his command vehicle, where he can rapidly analyze incoming information, decide whether he needs to call in additional units, fashion a plan to achieve core tactical objectives, and direct his men accordingly. It is in this capacity that he utilizes the experience and knowledge gained from decades spent rising through the ranks, and refreshed through daily training with his men, whose strengths and limitations inform his orders on command. If the firefighters at the frontline's burning edge are the strong arm of an emergency response, then the BC in his command vehicle is undoubtedly the brain.

The managerial nature of the BC's role can be seen even more clearly in light of his emergency-response-related authority. Aside from what has just been mentioned above, a BC may remove himself from service without the permission of superiors, not for a few minutes, but for a few hours. Conversely, he may unilaterally decide to add himself to any call. And finally, it is his prerogative, if arriving at a scene where a Company Officer already has command, simply to leave, even if the incident remains ongoing. These are not the kind of powers vested in furtherance of frontline firefighting duties. They are, instead, exactly the kind of powers one would expect to be vested in an individual who

15

must decide not only how best to direct others, but also where his own leadership abilities can do the most good; in other words, to an individual whose emergency response duties are managerial. *See Mullins*, 653 F.3d at 115.

The plaintiff BCs assert that treating the aforementioned in-station and emergency response duties as managerial is foreclosed by *Morrison*'s interpretation of the regulatory scheme, which supposedly prohibits treating as managerial all duties directly related to "first response." This is incorrect. In interpreting § 541.3(b)(2), *Morrison* states that training "meant to assur[e] a constant state of preparedness" could not be managerial because it "relate[s] directly to [a fire captain's] regular front line firefighting duties." *Morrison v. County of Fairfax*, 826 F.3d 758, 771 (4th Cir. 2016) (quoting *Barrows v. City of Chattanooga, Tenn.*, 944 F. Supp. 2d 596, 604 (E.D. Tenn. 2013). This emphasis on the importance of a fire captain's responsibilities at the frontline of an emergency response is a strong rejoinder to the plaintiffs' effort to muddy the distinction between frontline and non-frontline activity.

B.

With this understanding of the BCs' managerial duties in mind, the primary duty test becomes easy to apply, *see supra* at 11. As to the first factor, which looks to the relative importance of the BCs' exempt duties, the BCs' exempt, managerial duties, discussed above, greatly outweigh any other, non-exempt duties they might have. Consideration of the BCs' in-station responsibilities is most informative here. The deposition testimony of Division Chief Wooten, the BCs' direct superior, identified the BCs' primary role as "managing resources" for good reason: the staffing decisions that a BC must make on a

16

daily basis are indispensable to the ability of his entire battalion—which comprises five separate fire stations—to respond to emergency situations with even the most basic level of competence. If equipment as fundamental to fire response as the battalion's engines is staffed by groups without the numbers or the competence to operate them effectively, then the goal of safe and efficient response to unpredictable, life-threatening incidents is deeply compromised. The BCs' supervisory duties, which include evaluating Company Officers and line firefighters while taking active steps to ensure the entire battalion's operational readiness, are important for similar reasons. Discharge of these duties, unlike those belonging to the fire captains in *Morrison*, impact much more than the one out of ten emergencies to which the BCs themselves personally respond; they impact the effectiveness of every battalion member, in every single one of the incidents to which they respond, whether the BC is personally present on-scene or not.

The BCs' unique position in the CFD command structure further underscores the significance of their in-station managerial duties. Of all 449 of the CFD employees, there are only six officers who outrank BCs. Unlike BCs, these superior officers do not work 24-hour shifts; they do not train alongside the Company Officers and the line firefighters; they are further removed from on-the-ground emergency response; and they are burdened with many other responsibilities. The captains directly beneath BCs, however, typically lack anything close to the BCs' experience and expertise. The BCs are, therefore, uniquely situated in the CFD command structure. They are the only officers capable of discharging the necessary staffing and supervisory duties both effectively and efficiently, without which the CFD's entire operation would suffer.

17

The contrast with the fire captains in *Morrison* is stark. The *Morrison* captains had few in-station duties that were managerial in character, none of which approached the battalion-wide significance of the BCs' staffing and supervisory responsibilities. The "single biggest block" of their in-station time was spent in "daily training for their first response duties." *Morrison*, 826 F.3d at 763. While the CFD BCs organize the activity of entire battalions on a daily basis and regularly coach Company Officers on their response to specific incidents, the *Morrison* fire captains spent—at a maximum—twelve hours each year preparing annual evaluations for members of their crews. *Id.* at 763–64.

This same difference from *Morrison* is manifest in the context of emergency response: the most important role of a BC on the scene of an emergency is to establish a command structure, analyze incoming information, and direct the entire effort strategically from their command vehicles. The *Morrison* fire captains filled a role that was much more hands-on, working "side-by-side with their subordinates . . . . operat[ing] hoses and ladders, ventilat[ing] buildings, . . . and running into burning buildings." *Id.* at 763. In terms of the balance between exempt and non-exempt duties, then, the *Morrison* fire-captains are, if comparable to anyone in the CFD, comparable to its Company Officers, not its BCs.

The remaining factors may be quickly assessed. The second factor in the primary duty test—the amount of time spent performing exempt work—also militates in favor of treating BCs' primary duty as managerial. This is so for one very simple reason: a Battalion Chief plays a managerial role both while performing in-station duties and while engaged in emergency response.

18

With regard to the third factor, the BCs are also relatively free from direct supervision. While BCs work 24-hour shifts, their superiors do not. This leaves BCs not only unsupervised but also, in many respects, effectively without a superior for much of the time they spend on the job. Although hiring recommendations and the most serious disciplinary recommendations made by BCs are always subject to oversight and approval from above, the staffing and other supervisory decisions they make are not typically subject to direct supervision.

And once again, the contrast with the *Morrison* fire captains is instructive. The *Morrison* captains commonly worked their shifts with their superior officer "physically present at the station." *Id.* at 771. When this was not possible, they were nevertheless in "daily telephone or email contact." *Id.* The extent to which the captains were expected to use their independent judgement was, relative to the CFD BCs, quite limited. *Id.* (quoting testimony that "[a]ny good captain will tell you he doesn't have an opinion about anything. He has whatever opinion the fire chief tells him it is."). Comparing the *Morrison* captains and the CFD BCs is, in light of their multiple differences, just not plausible.

The fourth factor, which deals with the pay differential between the Battalion Chiefs and other employees, is less clear. The *Morrison* court looked to whether the pay range of the position at issue in that case overlapped with the pay range of the position immediately beneath it in the chain of command. *Id.* at 771–72. Here, the pay ranges overlap, and the average salary of a BC is only slightly greater than the average salary of a CFD captain, once one accounts for the latter's overtime pay.

19

Nevertheless, this fourth and final factor does not suffice to overcome the combined force of the first three factors, especially given that the primary duty analysis must be a "holistic one" that "step[s] back" to look at the position in question with a "broad[] lens." *Id.* at 772. For all of the reasons above expressed, the primary duty of the CFD BCs is not frontline firefighting, but management.

IV.

Because the BCs' primary duty is not frontline firefighting, the First Responder Regulation does not preemptively exclude the BC position from the executive exemption. What remains, then, is to apply the law of the executive exemption to the undisputed facts on the record, to determine if they show that BCs fall within its scope. To qualify as exempt executives, BCs must be employees:

> (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than [$455 per week][2] . . . ; (2) [w]hose primary duty is management of the enterprise in which the employee is employed . . . ; (3) [w]ho customarily and regularly direct[] the work of two or more other employees; and (4) [w]ho ha[ve] the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 CFR § 541.100(a). Neither party disputes that the plaintiff BCs satisfy the first and third prongs. The primary duty analysis above has already shown that they satisfy the

---

[2] At the time the BCs filed their complaint, the text of the regulation read, in relevant part: "Compensated on a salary basis pursuant to § 541.600 at a rate per week of not less than the 40th percentile of weekly earnings of full-time nonhourly workers in the lowest-wage Census Region . . . exclusive of board, lodging or other facilities." The CFD represented that this calculation, applied to the present case, worked out to $455 per week. Because the BCs raised no objection either below or on appeal, that is the figure we rely upon here.

second. And ultimately, even construing all reasonable inferences in favor of the plaintiffs, the record demonstrates that the BCs satisfy the fourth prong as well.

The parties agree that BCs sometimes made recommendations on "hiring, firing, advancement, or . . . other change of status," but dispute whether these recommendations were "given particular weight." Under the regulatory scheme, whether a court may find that such recommendations are accorded "particular weight" should depend, *inter alia*, on "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. The regulation further specifies that an employee's recommendations may have particular weight "even if a higher level manager's recommendation has more importance." *Id.*

Two duties of the BC role assume particular salience here: first, BCs sit on hiring panels; second, BCs recommend termination or suspension when they identify an inferior officer's infraction as sufficiently severe. To take the former duty first, the hiring panel process is structured in a way that strongly suggests the particular weight of BCs' recommendations. Hiring panels may include Company Officers, and even firefighters, but the typical panel during the relevant period had always, by design, at least one chief officer—either a Division Chief or a BC. This structural norm indicates a belief, on the part of those with final hiring authority, that the judgment of chief officers contains a degree of insight not shared by lower-ranked officers and that their presence on the panel makes its recommendations more trustworthy. It also indicates that Division Chiefs and BCs are

21

interchangeable for this purpose. Furthermore, the panel's recommendations, which take the form of numerical scores submitted by each panel member, are not aggregated into a composite score prior to their review by those with hiring authority. In short, the CFD's hiring process was specifically designed to solicit and preserve the input of BCs, demonstrating that their recommendations were specially relied upon and accorded "particular weight." Importantly, BCs could also spontaneously recommend captains for an Acting BC position; not one of these recommendations was ever rejected.

As for discipline, although the need to recommend termination or suspension has not arisen frequently, it is the clear role of the BCs to do so if warranted. J.A. 110, 1332. And there is no evidence, given the frequency with which the BCs' other disciplinary recommendations have been adopted, to suggest that such recommendations would not receive equally serious consideration. *Cf.* J.A. 546 (BC Gibson testifying "to the best of my knowledge, [Chief Wooten has] always supported [my disciplinary] recommendation[s]"); J.A. 361. The notion that a few rejected recommendations could be decisive contradicts the plain language of the regulation, which sets the standard at "particular weight," not complete or presumptive deference. Plaintiffs' argument on this point has not elsewhere met a hospitable reception. *See, e.g.*, *Holt*, 925 F.3d 905, 912 (6th Cir. 2019) ("[T]his element of the executive exemption does not require courts to ask whether an employee's recommendations as to personnel decisions were accepted every single time."); *Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 531 (D. Mass. 2008).

Plaintiff BCs therefore satisfy all four prongs of the executive exemption and, as executive employees, are not due overtime pay under the FLSA.[3]

## V.

We recognize that the FLSA can seem an arcane law, one which is difficult for both local governments and public employees to decipher. But there is an underlying thread of rationality to the statute and its regulations, which is that hourly workers who are the bulk of many a workforce are covered, but that those who operate in managerial capacities are not. *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 654 (2d Cir. 2012) (stating that the broad purpose of the executive exemption is "to distinguish managerial employees from non-managerial employees"). On the facts in the record before us, the Battalion Chiefs of the Chesapeake Fire Department fall plainly in the managerial category. The judgment of the district court is accordingly affirmed.

*AFFIRMED*

---

[3] Because we hold that the BCs are excepted from overtime pay under the executive exemption, we do not reach any arguments relating to the administrative or highly compensated employee exemptions.