**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1752**

_____

ANTHONY KELLY; GREGORY COOK; GERALD FAIR; JACK HOFFMAN; CHRISTOPHER KUNKLE; DAVID PLUNKETT; SAMUEL REYES; FREDERICK RUFF; MICHAEL SHARPE; CHAD LALLIER,

          Plaintiffs – Appellants,

      v.

THE CITY OF ALEXANDRIA,

          Defendant – Appellee.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:22−cv−00196−CMH−JFA)

_____

Argued:  May 9, 2025                          Decided:  December 31, 2025

_____

Before DIAZ, Chief Judge, KING, Circuit Judge, and Paula XINIS, United States District Judge for the District of Maryland, sitting by designation.

_____

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge King and Judge Xinis joined.

_____

**ARGUED:**  Robert Wesley Thayer Tucci, ZIPIN, AMSTER & GREENBERG, LLC, Silver Spring, Maryland, for Appellants.  David F. Dabbs, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Gregg C. Greenberg, ZIPIN, AMSTER & GREENBERG, LLC, Silver Spring, Maryland, for Appellants.  Brian D. Schmalzbach, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee.

_____

DIAZ, Chief Judge:

Current and former battalion chiefs for the City of Alexandria Fire Department sued the City seeking payment of unpaid overtime wages under the Fair Labor Standards Act. The district court granted summary judgment for the City, concluding that the chiefs were exempt from the Act's overtime-pay requirements under the "highly compensated employee" exemption. That exemption requires (among other things) that the City compensate the chiefs on a "salary basis."

We hold that the district court applied the incorrect salary basis test. But we nonetheless agree that the chiefs were paid on a salary basis. So we affirm.

I.

The Fair Labor Standards Act, 29 U.S.C. §§ 201–19, requires employers to pay non-exempt employees time-and-a-half when they work more than 40 hours in a week or—for fire protection employees with 28-day work periods (as here)—more than 212 hours in 28 days. *Id.* § 207(a)(1), (k); 29 C.F.R. § 553.201(a). Department of Labor regulations exempt "highly compensated employees" from this time-and-a-half overtime-pay requirement. 29 C.F.R. § 541.601(a); 29 U.S.C. § 213(a)(7). But the exemption applies only to employees who are paid on a salary basis. 29 C.F.R. § 541.601(b)(1); *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 44–45 (2023).[1]

---

[1] Employers also must satisfy other criteria for the exemption to apply. *See Gentry Hamilton-Ryker IT Solutions, LLC*, 102 F.4th 712, 718 (5th Cir. 2024); *Hughes v. Gulf Interstate Field Services, Inc.*, 878 F.3d 183, 188 (6th Cir. 2017). Because these are not at issue here, we don't discuss them further.

2

The regulations set out two salary-basis tests, which appear at 29 C.F.R. § 541.602(a) and 29 C.F.R. § 541.604(b).

The two tests serve the same goal: ensuring that an employer's "compensation system function[s] much like a true salary," offering "a steady stream of pay, which the employer cannot much vary and the employee may thus rely on week after week." *Helix*, 598 U.S. at 47. But they go about it differently.

602(a) applies to employees paid on a weekly (or less frequent) basis. *Helix*, 598 U.S. at 56–57. They are paid on a salary basis when they receive "at least part of [their] compensation through a preset weekly (or less frequent) salary" that isn't "subject to reduction because of exactly how [much they] worked." *Id.* at 46.

604(b) applies to employees paid on an hourly, daily, or shift basis. *Id.* at 56–57. They too are paid on a salary basis if the employer guarantees "the employee at least $455 each week (the minimum salary level), regardless of the number of hours, days or shifts worked," and the guarantee is "roughly equivalent to [their] usual earnings at the assigned hourly, daily or shift rate for [their] normal scheduled workweek." *Id.* at 47 (quoting 29 C.F.R. § 541.604(b)).

We turn then to the facts. But buckle up, for the chiefs' pay matrix is best summed up this way: "Confusion now hath made his masterpiece." William Shakespeare, *Macbeth* act 2, sc. 3, l. 76.

## A.

The Alexandria Fire Department has ten fire stations, split evenly between two battalions. The department employs ten battalion chiefs.

3

Battalion chiefs rotate through operational or administrative schedules. Typically, the department assigns six chiefs (three for each of the two battalions) to an operational schedule, during which they're responsible for the day-to-day operations of the fire stations within their assigned battalion. These chiefs are scheduled to work three 24-hour shifts according to a nine-day scheduling cycle.[2]

The nine-day cycles are staggered such that two operational chiefs are on duty each day (one for each battalion). During each nine-day cycle, the chiefs are on duty the first, third, and fifth days, and off duty the remaining six days. Their "work period" is 28 days.

The remaining four chiefs work an administrative schedule and handle special assignments. They typically work 40 hours per week and their "work period" is 14 days.

B.

As for their pay, the City sets an annual base salary for each chief, which it uses to calculate two "hourly rates"—one for operational shifts and one for administrative shifts.

The hourly rate for each shift is the chief's annual base salary divided by the average annual scheduled hours for each shift. For administrative shifts, the City calculates the hourly rate by dividing the base annual salary by 2080 hours. For operational shifts, however, the City divides the annual salary by 2912 hours.[3]

---

[2] But the staggered schedules of operational chiefs means that they may work between 48 and 68 hours per week.

[3] The 2,080 annual hours for administrative chiefs is the product of 40 hours times 52 weeks. Getting to the 2,912 annual hours for operational chiefs isn't as clean because their schedules vary over a 28-day work period. As best we understand it, the number assumes a 56-hour work week (which includes a combination of work and sleep time over a 24-hour shift) times 52 weeks. We discuss this anomaly later.

4

The chiefs are paid every two weeks. Each of these 14-day periods is a "pay period."

As relevant here, the City pays the chiefs—at the set hourly rate—for the following: the scheduled hours they work; the scheduled hours they don't work (with the City using paid leave for that purpose); and the hours they work off schedule.

Chiefs assigned to administrative work are scheduled to work 40 hours each week. And each paycheck compensates them for the 80 hours they're scheduled to work (paid leave for the hours they didn't work and regular time for the hours they did) and for any off-schedule hours they work.[4]

But the story's more complicated for chiefs working an operational schedule. Their *pay* period, like that of chiefs on an administrative schedule, is 14 days. But their *work* period is 28 days. And because of their nine-day scheduling cycle, they don't work a consistent number of hours in each 14-day pay period. So if the City paid them strictly based on scheduled hours, their paychecks could vary substantially from one pay period to the next.

To avoid that, the City pays those chiefs for at least 106 hours each pay period, regardless of the scheduled hours they work. And the City also pays them for the off-

---

[4] The chiefs resist this fact. *See e.g.*, J.A. 1350 (Declaration of Chief Jack Hockman) ("I have never heard of, been made of aware of, or seen any 'guaranteed' payment or salary when I work an administrative schedule."). But unlike the chiefs, the City brought receipts to court, in the form of payroll records showing (as the district court found) that the chiefs were "always paid a minimum of 80 hours' worth of work every two weeks." *Kelly v. City of Alexandria*, No. 22-cv-196, 2023 WL 3981272, at *2 (E.D. Va. June 13, 2023).

schedule hours they work, at the chief's hourly rate. The fight in this case is about this last category of hours.

## II.

The chiefs sued the City for unpaid overtime under the Fair Labor Standards Act. They claim that they're entitled under the Act to time-and-a-half pay for "overtime" hours (or, more precisely, off-schedule hours). The City says that the chiefs are exempt from the Act's overtime-pay requirements.

The district court granted summary judgment to the City. *Kelly v. City of Alexandria*, No. 22-cv-196, 2023 WL 3981272, at *6 (E.D. Va. June 13, 2023). At issue on summary judgment was whether the chiefs fell within the "highly compensated employee" exemption, which as relevant to this appeal, applies to employees paid on a "salary basis." *Id.* at *2–3.

The district court first considered which of two salary-basis tests to apply. The chiefs, said the court, were hourly-rate workers because in pay periods in which they worked more than 80 or 106 hours, "their pay for those weeks with overtime hours was always directly a function of those hours worked." *Id.* at *3. So the district court applied the § 604(b) salary basis test, which requires that employees receive a weekly guarantee of a minimum amount that bears "a reasonable relationship to their actual earnings in a normal scheduled workweek." *Id.* at *4.

The district court concluded that the chiefs' pay arrangement met these requirements. *Id.* First, the chiefs received (bi)weekly guarantees of a sufficient amount

6

because (1) they were paid for at least 80 hours in each administrative pay period and 106 hours in each operational pay period, and (2) at the applicable hourly rates, those amounts exceeded the minimum amount specified by regulation ($684 per week). *Id.*

Second, both weekly guarantees satisfied the reasonable relationship test. *Id.* For each of the two schedules (operational or administrative), the court compared the maximum hours a chief could be scheduled to work in a given week to the scheduled hours for which he would be paid. *Id.* Each ratio met the Department of Labor's reasonable relationship standard.[5] *Id.*

Because the chiefs were paid on a salary basis (and met the other requirements for the exemption), the district court held that they were "highly compensated employee[s]" exempt from the Fair Labor Standards Act's overtime-pay requirements. *Id.* at *5–6.[6]

This appeal followed.

---

[5] For this analysis, the Department of Labor compares "the employee's usual earnings at the assigned hourly . . . rate for the employee's normal scheduled workweek" to "the weekly guarantee." A ratio of 1.5 to 1, or less, satisfies the test. U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Nov. 8, 2018), 2018 WL 5921453, at *1–2. Rather than use "usual earnings at the assigned hourly . . . rate for the employee's normal scheduled workweek" in the numerator, the district court used the more conservative maximum number of hours a chief could be scheduled to work for each shift.

[6] The chiefs also brought claims under the Virginia Wage Payment Act, Va. Code § 40.1-29, and the Virginia Overtime Wage Act, *id.* § 40.1-29.2. The district court concluded that these state-law claims "fail[ed] as a matter of law because they require the City to be liable under the [Fair Labor Standards Act]." *Kelly*, 2023 WL 3981272, at *6. The chiefs don't challenge this conclusion on appeal.

7

III.

A.

We review a district court's grant of summary judgment de novo. *Emmons v. City of Chesapeake*, 982 F.3d 245, 250 (4th Cir. 2020). "Summary judgment is appropriate where there is no dispute of material fact and judgment is proper as a matter of law." *Id.*

The City has the burden to prove—by a preponderance of the evidence—that the chiefs are exempt employees. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47, 52 (2025).

B.

The question on appeal is whether the chiefs are compensated on a "salary basis," as required to satisfy the "highly compensated employee" exemption to overtime pay.

The district court concluded that the chiefs were paid by the hour, so it applied the 604(b) salary-basis test. The chiefs contend that the district court misapplied that test. The City, on the other hand, says that the court should have applied the 602(a) test.

Although the issue is clear as mud, we think the district court applied the wrong salary-basis test. Even so, the chiefs are still paid on a salary basis. So we affirm. *See Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 931 (4th Cir. 2025) (recognizing authority of courts of appeals to uphold judgments of district courts on alternate grounds).

IV.

A.

We start by reiterating the two tests.

8

Under 602(a), an employer must show that "the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). This standard ensures the employee "get[s] at least part of his compensation through a preset weekly (or less frequent) salary." *Helix*, 598 U.S. at 46. Though employers are generally prohibited from taking deductions from this amount, the regulations allow them to do so in certain limited circumstances. 29 C.F.R. § 541.602(b).

Under 604(b), "an employer may base an employee's pay on an hourly, daily, or shift rate without 'violating the salary basis requirement,'" *Helix*, 598 U.S. at 46–47 (quoting 29 C.F.R. § 541.604(b)), so long as two conditions are met. First, the employee must receive "a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b). And second, a "reasonable relationship" must "exist[] between the guaranteed amount and . . . the employee's usual earnings at the assigned hourly, daily or shift rate for the employee's normal scheduled workweek." *Id.*

The two tests work in tandem with 29 C.F.R. § 541.604(a), which permits employers to pay additional compensation on any basis—"flat sum, bonus payment, straight-time hourly amount, time and one-half," or using any other system. Additional compensation includes, for example, commissions, a percentage of profits, or "compensation based on hours worked for work beyond the normal workweek." 29 C.F.R. § 541.604(a). So long as the employee is guaranteed "at least the minimum weekly-required amount paid on a

9

salary basis," this additional compensation doesn't violate the salary-basis requirement. *Id.*

The Supreme Court explained in *Helix* that the "basis" on which an employee is paid determines which test applies. The "basis" is the "unit of time used to calculate pay." *Helix*, 598 U.S. at 52. When an employee is paid weekly (or on a less frequent basis), 602(a) applies. *Id.* at 56–57. But when he's paid on a daily, hourly, or shift basis, 604(b) applies. *Id.*

## B.

As the chiefs see it, their "payroll records show" that their "pay was calculated on an hourly basis [because] the 'unit or method for calculating pay' was an hourly unit." Reply Br. at 6 (quoting *Helix*, 598 U.S. at 53).

But we don't read *Helix* to hold that an hourly rate appearing on a paystub is enough to trigger the 604(b) test. For that would turn even the most assuredly "salaried" employees into hourly-rate workers if their employer's payroll software happened to convert their salary into an hourly rate. *Cf. McGuire v. City of Portland*, 159 F.3d 460, 464 (9th Cir. 1998) (rejecting claim that a fire chief's pay matrix like the one before us proved that plaintiffs were paid on an hourly, rather than salary, basis). So while the city's "intricate payroll accounting system" was "clearly designed to support a bureaucratic accounting agenda . . . it cannot be reasonably viewed as evidence that the [c]hiefs are in fact hourly employees." *Id.*

Instead, the question is what role the hourly rate plays in the chief's pay. Here, beyond the fact that some of the chiefs' compensation can (in a sense) be "calculate[d]"

10

using an hourly rate, the chiefs have little in common with the hourly-, daily-, and shift-rate workers that *Helix* described.[7]

An "[hourly]-rate worker . . . by definition is paid for each [hour] he works and no others." *Helix*, 598 U.S. at 51. That's not true for the chiefs. Even if they work fewer than 80 or 106 hours in a pay period, the City makes up the difference.

Relatedly, an "[hourly]-rate worker's weekly pay is always a function of how many [hours] he has labored," meaning "[i]t can be calculated only by counting those [hours] once the week is over—not, as § 602(a) requires, by ignoring that number and paying a predetermined amount." *Id.* That too, isn't true for the chiefs.

Their checks are not "always a function" of how many hours they worked.[8] If they work fewer than 80 or 106 hours, they're still paid the predetermined amount. And if they work fewer than 80 or 106 of their scheduled hours but take on additional off-schedule hours, they're, again, still paid for 80 or 106 hours, plus the off-schedule hours.

An hourly worker is "docked for time he takes off and uncompensated for time he is not needed." *Id.* at 52. Again, not so for the chiefs. They get various kinds of paid

---

[7] The employee in *Helix* worked on an offshore oil rig. 598 U.S. at 47. He stayed on the vessel for 28 days at a time and then had 28 days off. *Id.* Each paycheck "amounted to his daily rate times the number of days he had worked in the pay period." *Id.*

[8] Compare this with the employee in *Helix*. If he worked one day in a week, he'd be paid for one day of work. But take our administrative chief in this case. If that chief worked only one day (or even one hour) of those he was scheduled to work during a work period, he'd still be paid for 80 hours. And if that same chief, in the next work period, worked one scheduled day and additional off-schedule hours, he'd be paid for 80 hours plus the off-schedule hours.

11

leave, which they use to take time off (or when they're scheduled but not needed) to "true" them up to their predetermined amount (i.e., 80 or 106 hours).

The district court reasoned that the chiefs were hourly-rate workers because "in all two-week pay periods, when operational [chiefs] worked more than 106 hours and administrative [chiefs] worked more than 80 hours, their earnings directly correlated with the number of hours worked." *Kelly*, 2023 WL 3981272, at *3. In other words, "their pay for those weeks with overtime hours was always directly a function of those hours worked." *Id.*

Not quite. There's a direct correlation between earnings and hours worked for *some* pay periods in which the chiefs work off-schedule hours. For example, if an administrative chief works all his scheduled hours and works additional off-schedule hours, his pay would track the number of hours he worked.

But (as was the case here) the chiefs are also paid for the off-schedule hours they work in pay periods in which they use leave. In these instances, the City pays the chiefs for scheduled hours they don't work (through leave), so their pay is not "directly a function" of their scheduled and off-schedule hours.

## C.

All considered, we think the chiefs' hopelessly convoluted pay scheme is a slightly better fit for what *Helix* described as 602(a)'s domain. *See Silloway v. City of San Francisco*, 117 F.4th 1070, 1073 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1432 (2025); *see also Anani v. CVS RX Servs., Inc.*, 730 F.3d 146, 147–49 (2d Cir. 2013). Each chief receives "a [predetermined] amount" equal to either 80 or 106 hours "[biweekly] no matter

12

how many [hours] he has worked." *Helix*, 598 U.S. at 51. This "preset, fixed amount" in each paycheck "reflects how many weeks—not . . . hours—he has worked." *Id.* at 54. And—as 29 C.F.R. § 541.604(a) permits—each chief receives "additional compensation" for the hours worked outside his scheduled hours.[9]

Our conclusion doesn't change because the City uses paid leave to reach the predetermined amount. The Department of Labor has long permitted employers to "take deductions from accrued leave accounts" "without affecting their employees' exempt status"—so long as employees receive a full, predetermined amount. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22178–79 (Apr. 23, 2004) (codified at 29 C.F.R. pt. 541) (collecting sources); *see also* U.S. Dep't of Lab., Wage & Hour Div., Opinion Letter (Jan. 16, 2009), 2009 WL 649020, at *2.

Of course, if a chief were to exhaust his paid leave, the City would still have to pay him his base salary equivalent to 80 or 106 hours. But during the three years at issue, no chief exhausted paid leave. In fact, City officials stated that they weren't aware of that ever happening.

---

[9] The chiefs say that base pay salary the City quoted them and noted in their personnel records is the "predetermined amount" that we should look to in deciding this case. But "[t]o determine whether employees are compensated on a salary basis, [we] must look beyond conclusory language in contracts . . . [and] instead analyze how employees are actually paid. The proper focus for the salary basis test is whether an employee receives a predetermined amount of compensation on a weekly or less frequent basis, irrespective of any promises made in an employment contract." *Silloway,* 117 F.4th at 1072. The City's pay plan accomplishes just that.

It's also immaterial that some, or even a substantial, portion of a chief's paycheck may come from off-schedule hours. Indeed, the Department of Labor has recognized that an employee paid "a guaranteed salary" may receive a substantial and variable portion of their pay from "additional compensation." 69 Fed. Reg. at 22183 ("Such an employee's pay [may] understandably vary widely from one week to the next.").

## D.

We've concluded that the 80- and 106-hour equivalents are a "predetermined amount" paid every other week. But to satisfy 602(a), the City must also show that it didn't make improper deductions from this amount. It did not.[10]

## 1.

The parties briefed and the district court considered the question—albeit under 604(b). The district court reasoned that the existence of a "guarantee" for 604(b) purposes turns on whether "an employer has a practice of subjecting their employees to improper salary deductions based on the quality or quantity of their work." *Kelly*, 2023 WL 3981272, at *5 (citing *Coates*, 961 F.3d at 1048). It found that the City in fact provided the Chiefs with the requisite guarantee because "payroll records confirm[ed] that no . . . improper

---

[10] We also reject the chiefs' contention that the predetermined amounts the City paid shouldn't be considered guarantees because they were never explicitly provided for by contract. That argument may have had some legs under the prior iteration of the Department of Labor regulations, which explicitly tied the guarantee to an employment agreement. But in 2004, the Secretary amended the regulations such that the focus now is on the specifics of the pay plan in practice. *Coates*, 961 F.3d at 1048.

deductions took place as [the chiefs] were always given at least 106 or 80 hours['] worth of pay regardless of the hours worked." *Id.* We agree.

2.

Recall that the chiefs' operational-schedule hourly rates are calculated by dividing their assigned "annual salary" by 2,912, the annual scheduled hours for an operational shift. In some years though, the annual scheduled hours for some operational chiefs varied.[11] When that happened, those chiefs were paid slightly less than the annual salary amount used to calculate their hourly rates. From this, the chiefs conclude that the City made "illegal deductions" because it "fail[ed] to pay the [annual] 'base pay salary' each year due to the *quantum of hours* they work in a year." Appellants' Br. at 39.

This argument misses the mark. An employer may not make deductions from the *predetermined* amount. 29 C.F.R. § 541.602(a). But that predetermined amount isn't the annual salary figure the City assigns each chief—it's the equivalent of 80 hours at the administrative-schedule rate or 106 hours at the operational-schedule rate. So our concern is whether the City reduced that amount "because of variations in the quality or quantity of the work performed." *Id.*

The district court concluded (based on payroll records) that the City hadn't done so. We agree. The City paid the chiefs a predetermined amount (consisting of regular time

---

[11] The variation in hours is a function of the 9-day scheduling cycle allotted to three shifts. In practice that means, that in some years, a shift will be scheduled for slightly less than 2,912 hours, while another shift may be scheduled for slightly more than 2,912 hours. What doesn't change, however, is the City's commitment to pay its chiefs the predetermined amount per pay period, without regard to the hours worked.

15

and paid leave) equivalent to either 80 administrative hours or 106 operational hours. And because this amount wasn't subject to improper deductions, the chiefs were paid on a salary basis.

*   *   *

For these reasons, the district court's judgment is

*AFFIRMED.*